# WILLIAM E. FRISBIE AND ANOTHER v. S. ALLEN FRISBIE.[1]

June 25, 1948.

No. 34,657.

---

[1]Reported in 33 N. W. (2d) 23.

436

*P. E. Sargent,* for appellant.
*Joseph A. Streiff,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a judgment entered after trial and after the entry of an order refusing to grant defendant's motion for more definite and certain findings of fact as to the amount of compensation allowed him and expenses incurred by him and allowed.

1. It is fundamental that the review on appeal must be limited to the record. To justify reversal of a judgment, the record must show affirmatively that there was material error. 1 Dunnell, Dig. & Supp. § 386.

2. In the instant case there was no motion for a new trial. Ordinarily, an order denying a motion for more definite and certain findings of fact is nonappealable, but here the order was made after trial and before the entry of judgment; hence it can be reviewed. A nonappealable order made after trial and before the entry of judgment can be reviewed only upon an appeal from the judgment where no motion for a new trial has been made; hence, so long as the judgment may be questioned on appeal, the correctness of such order may also be attacked. 1 Dunnell, Dig. § 389, and cases under notes 30 and 40.

3. Plaintiffs are the brother and sister of defendant. Their action, tried before the court without a jury, was for an accounting of income and expenses on four farms, a wood lot, and three houses in Stewartville, Minnesota, inherited by the litigants from their de-

ceased father, who died intestate in 1942. They were tenants in common, each owning an undivided one-third interest. Defendant was a farmer living on one of the farms at the time of his father's death. He was administrator of his father's estate. Defendant was given a power of attorney on August 19, 1943, and, although it was drawn for a year, he continued to act under it until it was terminated November 12, 1946. Nothing was paid to plaintiffs during this period. The power of attorney authorized defendant to rent the property described therein and collect the rents, to deposit the receipts in a special account in the bank named, to pay out of the account taxes and insurance premiums, costs of minor repairs, and necessary expense. It provided that defendant was to furnish an annual account of receipts and disbursements. There was no provision for compensation to defendant.

Defendant moved to Stewartville in 1944 and lived on the 20-acre farm. He set up a checking account in the Stewartville National Bank. All the houses were sold, and the proceeds therefrom were deposited in the checking account. During 1946, defendant operated a portion of two farms. In operating these farms, he used his own machinery. He did not secure plaintiffs' consent to operate the places himself.

Defendant made his reports of receipts and disbursements for the years involved, the first one from about August 2, 1943, to August 14, 1944; the second from about August 17, 1944, to August 24, 1945; and the third from about August 27, 1945, to August 24, 1946. The terms of the fiscal years started at various times in August each year and continued to about the same time in August of the following year. The terms had no particular relation to the calendar year, the cropping season, or, apparently, to anything else in connection with the handling of the property. It is apparent that considerable controversy developed between plaintiffs and defendant in connection with these years. Dissatisfaction on the part of plaintiffs with the manner in which defendant was managing the property culminated in 1946, when plaintiffs received the report for that year wherein defendant claimed that plaintiffs owed him $4,728.30. The

result was this action for an accounting, started in December 1946.

A review of the record shows considerable confusion and uncertainty on the part of defendant at the trial in connection with his explanation of the accounts and certain charges and credits claimed by him for services, machine hire, and other claimed expense items while he was handling the property. There was no distinct separation of capital receipts from income receipts. Farm expense items were mingled with upkeep expenses in such a manner as to make it difficult to understand his accounting method. The efforts made in questioning him as a witness in order to clarify these confusions brought forth answers which were not always responsive or informative, but sometimes argumentative and uncertain. For example, when asked whether he knew how much the income amounted to from the property for the period from August 2, 1943, to August 14, 1944, he replied: "Well, it's all on those reports. * * * I kept track of the balance in the bank." As to this period, he further testified:

"Q. Would you think that amounted to $2,688.65?

"A. I couldn't say about that.

"Q. Did you ever add up the expenses for the period from August 2nd of '43 to August 14th of '44?

"A. You mean the expense of running the property?

"Q. The expenses contained in the Plaintiff's Exhibit 2, as you prepared and submitted to your brother?

* * * * *

"A. No.

* * * * *

"Q. Do you have any idea of the income during the period from August 2, 1943, to August 14, 1944, of farm rent as distinguished from the rental of the city property?

"A. No, I can't—I can't remember everything that ever happened in my life.

* * * * *

"Q. Now, going to your disbursements for the period from August 12th of '43 to August 14th of '44, do you have any idea of the amount of disbursements during that period?

"A. No, no, I don't.

"Q. If I were to say it was $2,059.23, do you think it would be that large?

"A. I couldn't say about that; I figured when I wrote a check— I figured there was money in the bank to pay the check, and that was more my concern than what the bill was."

As to this year, he was asked:

"Q. Then you have numerous items of rent and so on, you have hay and you have 344 bushels of corn; now, then, the next item you have got, 'Credit to heirs, $457.20,' then you got disbursements, what are the meanings of those items; did you give checks for those items or is that money you took in cash and paid out of your pocket, or just what is that?

"A. Well, I couldn't just say right now, but it was something apparently that I owed—apparently something that I owed for money that I had taken in.

\* \* \* \* \*

"Q. \* \* \* then you got disbursements on the opposite page, 'Advanced to pay hay balers, $22.60,' that money you advanced out of your own pocket?

"A. 'Advanced to pay hay balers,' you say?

"Q. Yes (nods).

"A. I can't just see that here—them reports I sent in were perfectly satisfactory. I don't see they got to be hashed over, back two or three years ago, all that stuff was perfectly okay with my brother and sister—I don't see what they want to hash that over for.

\* \* \* \* \*

"Q. Now, please answer the questions; how much property were you renting for the heirs?

"A. At what date?

"Q. For the period from August 12, 1943, to August 14, 1944; your first year as you showed there?

"A.  Well, now, I sold some houses there, and I—

"Q.  How much property were you renting?

"A.  I can't recall those things.

\* \* \* \* \*

"The Court: \* \* \* Now, he has asked you if there was any other farm that you had to find tenants for that year? Now, that is a simple question.

"Witness:  It might look simple, but it's pretty hard for me to remember three years ago.

"The Court:  Well, you kept accounts of this, or should have.

"Witness:  I got it on papers.

"The Court:  Look at the papers there, then.

"Witness:  I got no record of that.

"The Court:  Where are your records?

"Witness:  I never agreed to keep no record of that; all I agreed to keep records of it was the final part, and I got those records.

\* \* \* \* \*

"The Court:  You didn't answer the question that was asked of you; now, that is all we ask you to do. He asked when you first took it over did you have to find tenants for more than one farm, and your answer is, if I understood, you had to find tenants for two farms?

"Witness:  I was looking for a tenant for the place I lived on.

"The Court:  All right, you were looking for tenants for three places then?

"Witness:  Right.

"The Court:  We shouldn't have to spend this much time to get an answer.

\* \* \* \* \*

"Q.  \* \* \* now, for this first year how did you arrive at your figure showing a balance due you of $321.21 the first year?

"A.  Was that all I put in a bill for?

"Q.  That is right.

\* \* \* \* \*

"A.  Well, it's a little bit hard to say that right now.

"The Court: Just please answer the question. Don't waste our time arguing with him.

"Witness: Well, I arrived at it from the services I performed concerning the property, that is how.

"The Court: That doesn't tell me anything.

"Witness: Well, I rented this property and looked after all this property, and I naturally would expect some pay for it, wouldn't I?

"The Court: Certainly, but we are trying to find out how much you are entitled to and your statement doesn't give us any information on which we can decide that.

"Witness: I'd rather talk about what happened in the past year, my memory is better."

When questioned by the court as to where his original records were, he held up some papers.

"The Court: Is that the one he sent to the brother?

"[Attorney]: Yes.

\* \* \* \* \*

"The Court: Where are the records that you made this from?

"Witness: I've got the blank checks that I wrote.

"The Court: No, where is the record that you made these from; you made these from something or other?

\* \* \* \* \*

"The Court: What I am trying to get at is, is it memory work or whether it's based upon something definite.

"Witness: Well, it's based upon very definite at that time, but I can't remember back.

"The Court: Yes, but where are the records that you based it on?

"Witness: Well, I kept notes in notebooks.

"The Court: Where are the notebooks, that is what I want?

"Witness: I got them to home."

The record shows discussions between the attorneys and the court as to some understanding defendant had that the only report to be considered at the trial was the last one for the year 1946, which was then considered. Defendant attempted to explain certain items of

receipts, and said in part, "I just kept track of the money in the bank, what I received and what I spent." With reference to one item of expense, he was asked:

"Q. Now, you have an item here of use of machinery, tractor and personal services, until 8-24-46, $4,190; now, is that your service for the year 1945 to 1946?

"A. That is just what it says there in the account, use of the tractor and machinery and my services for that period of time."

This amount was split up to show $1,390 for use of tractor and machinery for 556 hours at $2.50 per hour, and $2,800 for services for that year. In addition, there was another expense item of $295 for the "use of car and repairs and gas" for the year from August 1945 to August 1946, for "tires about $75, and gasoline and oil about $120, and repairs $100." Against these items defendant showed a credit to the heirs of $180 for rent for one of the houses which he occupied part of the time. Defendant was asked if he thought it was good business to incur expense of $4,190 for the use of machinery and labor, $295 for the car, and produce approximately $2,000 of "income, plus the amount that is still on hand," and he replied "Why, yes, I do." He explained that during some of this time it was hard to get help, that he had to buy machinery and pay big prices for it, totaling about $2,500, in order to work part of the land, and said, "I stand to lose about fifty per cent of what I put into it to get the farm worked." He further explained that after his father's estate was closed and he first took over the management of the property under the power of attorney the intention was not to go on indefinitely, as he had in mind either to sell the property or to divide it with the heirs. He said that he thought it was to the best interests of the heirs that the property be kept up, as "my brother and sister was talking about selling them, and if they didn't look like anything they wouldn't get much for the places." He said he took care of the buildings and fences on the farm to the "Best of my ability, under the circumstances," and figured that the value of his services in keeping the buildings and farms in good condition was reasonably

worth $2,800. He claimed that in addition to that duty he had to see people in connection with the renting of the properties, and said that "about eight months in the year I worked on Sundays looking after the property and actually out laboring on these farms to get the work done, and people around to rent farms and rent pasture and come on Sunday, and come on Sunday to buy hay, and if I'm not around there why things are not taken care of—just about took my full time."

In order to keep this opinion within reasonable bounds, we are precluded from going into all the details regarding the various confusions in the testimony with reference to the accounting. We have made the above references to part of defendant's testimony, not with any desire to criticize or embarrass him, as he was primarily a farmer and did not claim to be a public accountant, but to show from his testimony and records the difficult task imposed upon the trial court to untangle the figures and get as clear an understanding as possible in order to make its findings and conclusions. The court made a commendable effort to bring about a clarification of the records during the time defendant managed the property, as shown by the following pertinent portions of the findings and conclusions:

"3. That defendant's receipts and expenses from the rental of said lands and houses, and from farming operations, are as follows:

|  | "Receipts | Disbursements | Balance |
|---|---|---|---|
| "1943–44 | 2,374.61 | 413.99 | 1,960.62 |
| "1944–45 | 1,690.65 | 1,535.89 | 154.76 |
| "From the 1946 acct. | 786.57 | 407.89 | 378.68 |
| "1945–46 | 6,209.20 | 4,139.47 | 2,069.73 |
|  | "11,061.03 | 6,497.24 | 4,563.79 |

"4. That the defendant expended for taxes, insurance, repairs and improvements of the real estate he so possessed and managed in behalf of himself and the plaintiffs, the following sums:

| "1943–44 | 1,645.24 |  |
|---|---|---|
| "1944–45 | 2,032.31 |  |
| "1945–46 | 841.79 | 4,519.34 |

"That the defendant, acting as agent for himself and the plaintiffs, sold certain of the real estate inherited from their father and received certain sums from the father's estate for himself and plaintiffs. That the receipts thereof are:

"1943–44 ................................. 1,002.04
"1944–45 ................................. 1,296.90
"1945–46 ................................. 1,099.90   3,398.84

"Deficit ........................................ 1,120.50

"That the defendant occupied one of the houses so inherited from his father and which he possessed and managed under the above described agreement; that the sum of fifteen dollars ($15.00) per month is a fair and reasonable rental for his use thereof; that he occupied the same prior to August 24, 1944, and was indebted therefore in the sum of ninety dollars ($90.00) but that he applied said sum upon the payment of expenses incurred in operating the farms, and has taken into account in the above figures; that:

"For the year ending August 24, 1945, he is justly indebted in the sum of one hundred eighty dollars.......... $180.00

"For the year ending August 24, 1946, he is justly indebted in the sum of one hundred eighty dollars......... 180.00

"For the occupancy of said house from August 24, 1946, to date of the partition sale, he is justly indebted in the sum of one hundred seventeen dollars.................... 117.00

"He was paid a refund on certain purchases returned in the sum of eight dollars seventy cents.................. 8.70

"Summary

"Received from rentals and operating farm........... $4,563.79
"Occupancy of house by defendant................... 477.00
"Refunds ....................................... 8.70

"Total Receipts ............................. 5,049.49
"Deficit from payment of taxes, insurance and upkeep.. 1,120.50

"Total owed to heirs .............................. 3,928.99
"To each heir .................................... 1,309.67

"That defendant is justly indebted to each of the plaintiffs in the sum of thirteen hundred nine dollars sixty-seven cents ($1,309.67) and to himself thirteen hundred nine dollars and sixty-seven cents ($1,309.67).

"AS CONCLUSIONS OF LAW

"That plaintiffs are entitled to judgment against the defendant decreeing him to be justly indebted to each of them in the sum of thirteen hundred nine dollars and sixty-seven cents ($1,309.67)."

In an action for accounting, the finding of a balance due necessarily negatives all items litigated and not allowed in arriving at the balance. The burden is upon defendant to show that there is no substantial evidence reasonably tending to sustain the findings of fact. 1 Dunnell, Dig. & Supp. § 64a.

In order to better understand the problems involved, we quote the trial court's memorandum made in connection with its findings and conclusions:

"This case has developed considerable unnecessary antagonism and controversy, largely through the defendant's methods of accounting. He made his fiscal year start variously from the 17th to the 24th of August, to about the same date the next year. This had no relation to either calendar year, to the cropping season, or anything else connected with his agency, and consequently made his accounts very difficult to understand and required major readjustment to make them intelligible. In the second place he mingled capital receipts with income receipts and farm expenses with upkeep expenses which added further to the difficulty in understanding his accounts.

"Thus his last account rendered August 24, 1946, added to his other two accounts, showed that he had taken in a total of $9,473.37 and had expended a total of $9,120.14, leaving a balance of $353.23 as the total profit for the three years. However, he put in a demand of $4,728.30 for his own services and for use of his tractor and car. If this were allowed, his three years management of the property

would show a deficit of $4,375.07, and this included not only the entire income from the farm and rental of the houses, but also $3,398.84 realized from the sale of real estate. The plaintiffs can hardly be blamed for charging gross misconduct. To them it seemed utterly impossible that these farms in this day of the highest prices the world has ever known could be operated at a loss for three years in succession.

"However, after the trial he submitted a subsequent account which showed an additional farm income of $5,092.84. This changed the picture materially, but nevertheless leaves much to be explained.

"A final examination of the various accounts he has rendered discloses that he spent $4,519.34 on taxes, insurance, upkeep and repair of the real estate, while taking in only $3,398.84 from the sale of real estate. This $4,519.34 was an expenditure for the benefit of the three heirs, and has been reflected in the price paid at the sale. It was well worthwhile and he should be given full credit for it.

"He operated the farm the third year himself without tenants, and his accounts are not in such shape that they can be analyzed satisfactorily. His account is therefore treated on a rental basis, giving him two-thirds of the entire income for that year's operations."

4–5. Our review of the trial court's findings and conclusions is necessarily limited because of the confused state of the records and the method of accounting. The trial court arduously attempted to clarify these records, which, despite defendant's well-meaning attempts to keep accounts, were in a condition difficult to reconcile. From the facts at its disposal, the court's task was to allocate as accurately as possible the funds for the years involved so as to apportion the net receipts among the three owners of the property. This it did by granting to the heirs, including defendant, the sum of $1,309.67 as the share due each. We believe that there is sufficient evidence to support the trial court's findings under the rule that where an action is tried by the court without a jury its findings of fact are entitled to the same weight as the verdict of a jury and will not be reversed on appeal unless they are manifestly and palpably contrary to the evidence. This rule applies whether the appeal

is from a judgment or from an order granting or denying a new trial, and whether the evidence is oral or documentary. 1 Dunnell, Dig. & Supp. § 411, and cases cited. For these reasons, we believe that the judgment here should be affirmed.

6. In connection with the other part of defendant's appeal from the order refusing to grant his motion for more definite and certain findings of fact as to the amount of compensation allowed him and expenses incurred by him and allowed, we review this order only in connection with the appeal from the judgment, as otherwise it would have been a nonappealable order.

Defendant moved for an order amending the findings and conclusions on the grounds: (1) That the findings do not find the amount of compensation allowed defendant for his services as agent of plaintiffs relative to the cause under consideration; (2) that said findings do not allow or disallow those certain items of expense incurred by defendant in the last 18 months of operation of said real estate for the benefit of plaintiffs, as well as defendant, and duly accounted to the court at the time of trial.

The court denied the motion with reference to defendant's claim for compensation except as allowed in the findings of fact and conclusions of law, and in its memorandum said:

"The defendant wishes to know how much income has been allowed him in order that he may properly report it in his income tax returns. The accounts filed for the years of 1943-44, 1944-45, show certain payments made to the defendant by check. Those payments have been allowed in the findings. Payments to him shown in the 1946 account are not allowed, except as they are a part of the $4,139.47 item in disbursements which has been allowed. That item of $4,139.47 includes both his expenses and compensation for that year.

"The defendant was in a fiduciary relation to the plaintiffs in the operation of these farms and owed them a duty which he may have performed or may not. It is impossible to tell from his accounts and he should consider himself fortunate that the court has allowed him as much as it has."

Defendant admits in his brief that he received a total compensation for his services during the period of $1,791.39, but contends that this amount was entirely inadequate for the services he rendered. Plaintiffs claim that defendant received $2,033.31 in cash and $477 in rent. The court, in its memorandum in connection with the order denying defendant's motion to amend the findings and conclusions, calls attention to the fact that certain payments made to defendant by check, as shown by the accounts filed for the years 1943-1944, 1944-1945, were allowed, but states that payments to defendant as shown in the 1946 account were not allowed except as they are part of the $4,139.47 item in disbursements, which was allowed. That item, according to the memorandum, included both the expense and compensation for that year. Defendant also was allowed his share of the $3,928.99 shown in the findings, which amounted to $1,309.67. It appears to us that the trial court took all these matters into consideration in denying defendant's motion, and we shall not disturb its order. After hearing the evidence and analyzing the records and reports, the trial court must have concluded that it had allowed defendant all he was entitled to, for it concluded its memorandum by saying that "he should consider himself fortunate that the court has allowed him as much as it has."

Affirmed.